UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JASON BARRY,

            Plaintiff,

    v.

Commissioner of Social Security
Administration,

            Defendants.

Case No. 17-cv-06394-LB

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

Re: ECF Nos. 25, 31

## INTRODUCTION

    Plaintiff Jason Barry seeks judicial review of a final decision by Acting Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and XVI of the Social Security Act.[1] He moved for summary judgment on August 10, 2018.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment on November 9, 2018.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge jurisdiction.[4] The court grants the

---

[1] Compl. – ECF No. 1 at 1; Mot. – ECF No. 25 at 4. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 25.

[3] Cross-Mot. (*amended*) – ECF No. 31.

[4] Consent Forms – ECF Nos. 12, 13.

plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings

consistent with this order.

### STATEMENT

#### 1. Procedural History

On October 23, 2014, the plaintiff, then aged 42, filed an application for social-security-

disability insurance ("SSDI") benefits under Title II of the Social Security Act ("SSA").[5] He also

filed an application for supplemental-security income on October 23, 2014 under Title XVI.[6] His

claims were denied on February 27, 2015, and again on reconsideration on June 8, 2015.[7] The

plaintiff filed a written request for hearing on June 24, 2015.[8] He appeared and testified at a

hearing held on November 1, 2016.[9]

Administrative Law Judge Teresa L. Hoskins Hart ("the ALJ") issued an unfavorable decision

on January 13, 2017.[10] The plaintiff filed this action for judicial review on November 7, 2017 and

moved for summary judgment on August 8, 2018.[11] The Commissioner opposed the motion and

filed a cross-motion for summary judgment on November 9, 2018.[12]

---

[5] Compl. – ECF No. 1 at 1.

[6] *Id.*

[7] AR 130–33, 137–44. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[8] AR 142.

[9] AR 44.

[10] AR 23–38.

[11] Compl. – ECF No. 1; Mot. – ECF No. 25.

[12] Cross-Mot. (*amended*) – ECF No. 31.

## 2. Summary of the Administrative Record

### 2.1 Medical Records

#### 2.1.1 Amy Solomon, M.D. — Treating

Dr. Solomon is the plaintiff's primary-care doctor and — with other health-care providers at Balance Health of Ben Lomand — has treated the plaintiff since 1996.[13] On December 6, 2013, Dr. Solomon diagnosed the plaintiff with chronic pain due to trauma, and on May 4, 2015 she diagnosed him with chronic pain lasting longer than three months.[14] In August 2014, Dr. Solomon diagnosed the plaintiff with a sprain/strain of his shoulder/arm, degenerated-lumbar/lumbosacral disc, mixed hyperlipidemia, displaced-lumbar-intervert disc, and testicular hypofunction.[15] On December 17, 2014, Dr. Solomon confirmed her prior diagnoses and diagnosed the plaintiff with lumbar-spinal stenosis.[16] On May 4, 2015, Dr. Solomon confirmed her prior diagnoses and diagnosed the plaintiff with degenerative-cervical-spinal stenosis, degenerative-lumbar-spinal stenosis, and elevated-intraocular pressure.[17]

On December 6, 2013, Dr. Solomon diagnosed the plaintiff with chronic pain due to trauma.[18] The plaintiff was back in school for horticulture and "was moving on from [his] wife's death."[19] Dr. Solomon noted that the plaintiff was aware of the addictive nature of his medications and was trying to decrease morphine use.[20] The plaintiff was "well-appearing, well-nourished in no distress," and he had "intact recent and remote memory, judgment and insight, and normal mood and affect."[21]

---

[13] *See* AR 378–505, 512–29, 603–10, 564.

[14] AR 381.

[15] *Id.*

[16] *Id.*

[17] *See* 381, 514

[18] AR 397.

[19] AR 396.

[20] *Id.*

[21] AR 397.

On July 22, 2014, the plaintiff visited Dr. Solomon and PA Julie Gorshe with shoulder pain caused by an injury he sustained getting out of a truck.[22] The plaintiff's shoulder was not swollen.[23] He had moderate pain that was exacerbated when he moved his shoulder, and it was hard for him to hold his arm up.[24] The plaintiff had difficulty with heavy lifting, and his activity was limited.[25] His left shoulder was tender.[26] An x-ray of his shoulder was negative for acute fracture.[27] Dr. Solomon recommended that the plaintiff come in for a follow-up appointment in five days.[28]

On August 1, 2014, Dr. Solomon noted that the plaintiff had cracking and popping in his shoulder and pain with movement.[29] There was no "swelling, warmth, numbness or weakness."[30] The plaintiff had stopped swimming since his shoulder injury.[31] He had decreased range of motion in his shoulder.[32] Dr. Solomon diagnosed the plaintiff with sprain/strain of the shoulder/arm and chronic pain due to trauma.[33] Dr. Solomon noted that the plaintiff was too distressed to continue with his school, and the stress was making him panic.[34] The plaintiff had tried Cymbalta on 30mg three years before and stopped because it did not help.[35] The plaintiff was willing to try Cymbalta again at a higher dose.[36] Dr. Solomon noted that the plaintiff could not find a job and had moved

---

[22] AR 408.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] AR 409.

[27] *Id.*

[28] AR 410.

[29] AR 393.

[30] *Id.*

[31] *Id.*

[32] AR 394.

[33] *Id.*

[34] AR 393.

[35] AR 394.

[36] *Id.*

back in with his mother.[37] Dr. Solomon referred the plaintiff to Dr. Victor Li, a pain-medicine specialist.[38]

On August 21, 2014, Dr. Solomon diagnosed the plaintiff with testicular hypofunction, chronic pain due to trauma, a displaced lumbar-intervert disc, and prolonged-depressive reaction.[39] Dr. Solomon "felt that [the plaintiff] [was] too disabled to work and recommended permanent disability."[40] Dr. Solomon said that the plaintiff wanted to go back to work, but was only able to perform small chores, including feeding pets and washing dishes.[41] Dr. Solomon stated that the plaintiff could not walk or swim daily due to shoulder pain.[42] Dr. Solomon recommended that the plaintiff apply for permanent disability, drop out of school for the semester, and participate in volunteer work.[43]

On October 16, 2014, the plaintiff told Dr. Solomon that he spoke with his attorney and agreed to apply for social-security benefits based on permanent disability.[44] Dr. Solomon wrote, "I do not think he is able to work and may even be permanently disabled between the back and PTSD."[45] Dr. Solomon ordered an x-ray and MRI of the plaintiff's lower back and suggested that he participate in a sleep study.[46]

On December 17, 2014, the plaintiff reported that he had seen Dr. Li, and approval of an MRI was pending for the commencement of injections.[47]

---

[37] AR 393.

[38] AR 394.

[39] AR 391.

[40] AR 390.

[41] *Id.*

[42] AR 391.

[43] AR 391, 392.

[44] AR 388.

[45] AR 389.

[46] *Id.*

[47] AR 385.

On May 4, 2015, after reviewing x-ray and MRI results, Dr. Solomon confirmed her prior diagnoses of degenerative-lumbar-spinal stenosis, degenerative-cervical-spinal stenosis, chronic back pain, displacement of lumbar-intervertebral disk, and elevated intraocular pressure.[48] Dr. Solomon said that the plaintiff would not be able to work and that he could not "sit or stand for any length of time and require[d] high dose medication."[49]

On January 28, 2016, Dr. Solomon filled out a Residual Functional Capacity ("RFC") questionnaire for the plaintiff's SSDI application.[50] Dr. Solomon noted that the plaintiff had reduced range of motion and positive straight-leg raising on the left and right at 45 degrees.[51] Dr. Solomon noted that the plaintiff's impairment was reasonably consistent with his symptoms and functional limitations.[52] She said that the plaintiff could not walk more than one block without taking a rest, could not sit more than twenty minutes before needing to get up, and could not stand more than fifteen minutes before needing to sit down.[53] The plaintiff needed a job that allowed him to sit, stand, or walk at will and the plaintiff could never lift weight more than ten pounds.[54]

### 2.1.2    Victor Li, M.D. — Treating

Dr. Li is a specialist in pain medicine. Dr. Solomon referred the plaintiff to Dr. Li for his shoulder injury and back pain.[55] On December 8, 2014, Dr. Li noted that the plaintiff's chief complaint was low-back pain radiating down to his bilateral-lower extremities with a secondary complaint of neck pain radiating down to his bilateral-upper extremities.[56] The pain was "aching and stabbing," and the pain in his right knee was constant.[57] The plaintiff described the intensity of

---

[48] AR 515.

[49] AR 516.

[50] AR 564–67.

[51] AR 565.

[52] *Id.*

[53] AR 565, 566.

[54] AR 566.

[55] AR 370–77, 499.

[56] AR 370.

[57] *Id.*

his pain as a nine out of ten.[58] Walking, bending, lifting, sitting, lying down, coughing and sneezing made the pain worse, while lying down, sitting, and resting made the pain better.[59]

In November 2014, the plaintiff had an x-ray of his lumbar spine, which showed "left-sided scoliosis with fairly extensive degenerative-disc disease status post laminectomy."[60] There was "mild to moderate leftward scoliosis centered on L3."[61] There was "narrowing of the right aspect of the L3–4 disc space [and] the left aspect of the L1–2 disc space," and a "more diffuse narrowing of all of the lumbar disc spaces with spurring at all the lumbar levels anteriorly."[62] "Some endplate sclerosis [was] seen at L3–4 and L4–5" and the "[a]lignment was otherwise maintained."[63]

Dr. Li performed lumbar-spine and cervical-spine examinations, and the plaintiff's muscle strength in both examinations was five out of five.[64] Dr. Li prescribed morphine for the plaintiff's pain and ordered MRIs of his cervical and lumbar spine to determine structural abnormalities.[65]

On May 22, 2015, Dr. Li reported that the plaintiff had "continued pain in his low back and neck with associated numbness down his bilateral lower extremities, worse on the left," and "pain and numbness radiating to his shoulders and into his bilateral upper extremities and hands."[66] The plaintiff's pain level was seven out of ten.[67] Dr. Li found "tenderness to palpation of the lumbar and cervical paraspinals" and "[d]istribution of pain along the L3, L4, L5 dermatomes of the bilateral lower extremities, left worse than right."[68] Dr. Li suggested that the plaintiff continue

---

[58] AR 371.

[59] Id.

[60] Id.

[61] AR 375.

[62] Id.

[63] Id.

[64] AR 372, 373.

[65] AR 371, 373.

[66] AR 535.

[67] Id.

[68] AR 536.

with lumbar-epidural-steroid injections and would "consider cervical-epidural-steroid injection following lumbar-epidural-steroid injection for relief of neck pain and radiculopathy down the upper extremities."[69]

On June 29, 2015, Dr. Li found that the plaintiff's tenderness to palpation and distribution of pain was the same as the last visit and that the plaintiff's level of pain was six out of ten.[70] The plaintiff denied being depressed and having insomnia.[71] Dr. Li stated that he would "consider lumbar-epidural-steroid injection as well as cervical-epidural-steroid injection for relief of pain in plaintiff's neck and low back in the future."[72] The plaintiff told Dr. Li that he would like to be referred to an orthopedic surgeon before proceeding with epidurals.[73] Dr. Li referred him to Dr. Mathias Daniels, an orthopedic-spinal surgeon.[74]

### 2.1.3    Mathias Daniels, M.D. — Treating

Dr. Daniels noted that the plaintiff had low-back pain, degeneration of the intervertebral disc, and lumbar radiculopathy.[75] Dr. Daniels completed a physical exam and found that the plaintiff was obese.[76] The plaintiff had a normal gait, no limp, and ambulated without assistive devices.[77] He had a flat back with loss of lumbar lordosis on visual inspection.[78] There was tenderness of the spinous process at L4, the transverse process on the right at L3, the transverse process on the left at L3, and the sacrum.[79] There also was pain with motion and tenderness to the suspranous

---

[69] *Id.*

[70] AR 530.

[71] *Id.*

[72] AR 531.

[73] AR 530.

[74] AR 531

[75] AR 551.

[76] AR 553.

[77] *Id.*

[78] AR 554.

[79] *Id.*

ligament, the paraspinal region at L3, and the iliolumbar region.[80] The plaintiff's motor strength was normal and his knee reflexes were diminished.[81] The plaintiff had decreased sensation in his knee, leg, and foot.[82]

On October 21, 2015, the plaintiff visited Dr. Daniels to review lumbar-spine x-rays.[83] Dr. Daniels said that the plaintiff was likely a surgical candidate.[84] He suggested that the plaintiff lose weight and decrease his medication to prepare for surgery.[85]

On December 16, 2015, Dr. Daniels stated that the plaintiff was likely a candidate for LS2–S1 PSIS.[86] He noted that the plaintiff would continue to make attempts at decreasing his weight and increasing exercise tolerance.[87]

On March 21, 2016, the plaintiff reported "lateral and posterior radiating pain left greater than right into the dorsum of bilateral feet," and "numbness in the stools of bilateral feet and generalized bilateral leg heaviness."[88] The plaintiff's level of pain was an eight out of ten.[89] His symptoms included weakness, numbness, tingling and radiation down legs.[90] Changing positions, resting, and narcotics alleviated the pain, and sitting, standing, walking, twisting, bending and squatting, and pushing and pulling aggravated the pain.[91] The plaintiff could walk for about ten

---

[80] Id.

[81] Id.

[82] Id.

[83] AR 549.

[84] Id.

[85] Id.

[86] AR 545.

[87] Id.

[88] AR 561.

[89] Id.

[90] Id.

[91] Id.

minutes before having to sit down because of "heavy legs."[92] Dr. Daniels confirmed his prior diagnosis of obesity.[93]

Dr. Daniels opined that the plaintiff had multilevel-lumbar spondylosis "that had been refractory to multiple conservative treatments including activity modification, injections, massage therapy, physical therapy, nonsteroidal anti-inflammatories and narcotics."[94] The plaintiff was an "appropriate surgical candidate," but considering his current psychosocial status, Dr. Daniels found it reasonable that the plaintiff wished "to defer further discussion of operative intervention at [that] point."[95] Dr. Daniels stated that "the patient's functionality ha[d] decreased over 50% over the last 2 years. He [was] also having a difficulty [with] mobility and bending activities. His activities of daily living such as toileting and cooking [were] limited. The patient [] failed individual physical therapy/medication trials and injection therapies."[96] Dr. Daniels opined that the plaintiff "met all of the criteria of the MTUS [Medical Treatment Utilization Schedule] guidelines for an outpatient functional restoration program evaluation." [97] Dr. Daniels listed the criteria for an outpatient pain rehabilitation program under MTUS:

An adequate and thorough evaluation has been made, which we are requesting today.

Previous methods of treating chronic pain have been unsuccessful, as mentioned above for this patient.

The patient has significant loss of ability to function, and the patient has decreased his/her activities of daily living since the day of injury.

He is not a candidate for other surgical interventions.

The patient exhibits motivation and willingness to forgo secondary gains. . . .[98]

---

[92] *Id.*

[93] AR 562.

[94] *Id.*

[95] *Id.*

[96] AR 563.

[97] *Id.*

[98] *Id.*

On May 11, 2016, Dr. Daniels noted no "change in [the plaintiff's] axial back complaints."[99] Clinical and imaging studies were consistent with multi-level-lumbar spondylosis refractory to multiple conservative modalities.[100] Dr. Daniels recommended a chronic-pain psychology consultation.[101] Dr. Daniels opined that the plaintiff was in the process of obtaining permanent disability and that it was prudent for him to "defer surgery until after [his] social economic status stabilizes."[102] Dr. Daniels diagnosed the plaintiff with degeneration of intervertebral disc and said he was "deciding about surgery for a herniated disc."[103]

### 2.1.4    Aaron Morse M.D. — Treating

The plaintiff visited Central Coast Sleep Disorder Center regarding his sleep problems on May 21, 2009 and June 4, 2009.[104] Nurse Practitioner Helena Norris stated in her preliminary consultation notes that the plaintiff had "a history of heavy snoring for many years, witnessed apneas and choking and excessive daytime sleepiness" and "chronic back pain due to a work related injury in 19[9]7."[105] The plaintiff underwent a sleep study on May 29, 2009.[106] Dr. Morse found that the plaintiff had "severe complex (central and obstructive) sleep apnea."[107] Dr. Morse noted that the "central apnea was [probably] related to his use of narcotic pain medication."[108] The plaintiff was put on a continuous positive airway pressure ("CPAP") machine for apnea.[109] Dr.

---

[99] AR 559.

[100] Id.

[101] Id.

[102] Id.

[103] Id.

[104] AR 339, 341.

[105] AR 339.

[106] AR 355.

[107] Id.

[108] Id.

[109] AR 339.

Morse later reported that the CPAP "resulted in improvement in snoring, apnea and hypopneas, and improvement in oxygen saturation."[110]

### 2.1.5    Christopher Summa, M.D. — Treating

The plaintiff visited Dr. Summa, a spinal and orthopedic surgeon, on April 6, 2017.[111] Dr. Summa diagnosed the plaintiff with severe degenerative scoliosis of the lumbar spine, severe spinal stenosis, obesity, and high-dose opiate dependency.[112] Due to the degenerative changes present in the plaintiff's lumbar spine, he was a candidate for a reconstructive procedure to his lumbar spine.[113] Dr. Summa was concerned that, due to the plaintiff's weight and high-dose opiates, he was at significant risk of post-operative complications.[114] Dr. Summa suggested that the plaintiff work with Dr. Solomon on his opiate use and engage in an aggressive weight-loss program in order to continue with plans for a reconstructive surgery.[115]

### 2.1.6    Jennifer Lin, M.D. — Examining

On January 26, 2015 the plaintiff had an MRI of his lumbar spine.[116] Dr. Lin reported the MRI findings.[117] Dr. Lin indicated there was levoscolioisis of the lumbar spine and multilevel-degenerative changes of the lumbar intervertebral discs and facets.[118] There was central-canal stenosis and neural-foraminal narrowing.[119] Dr. Lin also reported that there were multiple areas with disc desiccation, loss of disc height, lateral protrusions, and joint arthrosis.[120]

---

[110] AR 345.

[111] AR 8–12.

[112] AR 8.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] AR 538, 540.

[117] AR 538.

[118] AR 539.

[119] *Id.*

[120] *See* AR 538.

### 2.1.7     Kim Goldman Psy. D. — Examining

In January 2015, Dr. Goldman performed a complete psychological evaluation of plaintiff at the request of the Department of Social Services.[121] Dr. Goldman noted that the plaintiff "was widowed on January 7, 2012. He live[d] with his mother in an apartment. His source of income [was] food stamps."[122] The plaintiff dropped out of high school, obtained a GED, completed two semesters at a community college, and received vocational training in an "iron worker apprenticeship [and an] automotive program."[123] The plaintiff's longest-held job was as an iron worker, which he did "over the course of approximately 12 years."[124] "His most recent job was as a caregiver from 2008 through August 15, 2013.[125]

Dr. Goldman noted that the plaintiff had pain in "'[his] whole back, shoulders, knees, [and] ankles from all the heaving lifting replacing re-bar, all the labor.'"[126] The plaintiff had never been psychiatrically hospitalized or treated by an outpatient-mental-health provider.[127] The plaintiff took Prozac in 2000 for a year until he stopped because he "was feeling better."[128] The plaintiff "[drove] a car without restriction. He was able to shower, bathe, groom and dress himself without help. He was able to pay bills and keep track of money without help from other people."[129] Dr. Goldman continued, "[w]hen asked to describe what he does in a typical day he reported 'not much because my physical condition, sit on the front porch, walk my dog 30 yards.'"[130]

---

[121] AR 507–511.

[122] AR 508.

[123] *Id.*

[124] *Id.*

[125] AR 508; *see* AR 36.

[126] AR 509.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

Dr. Goldman noted that the plaintiff was "pleasant and cooperative throughout the evaluation" and that he "presented with a mildly restricted range of affect and mildly dysthymic mood."[131] The plaintiff described his mood as "depressed quite a bit, all the losses I've had recently, I can't do the work I used to do because of medical problems, see my friends with their children/family that affects me."[132] The plaintiff reported that he had difficulty sleeping due to pain and stress.[133] "No problems with appetite were indicated."[134] Dr. Goldman noted that the plaintiff "responded in a coherent and relevant fashion," he "was alert and aware of his surroundings," his memory was intact, his "attention to instructions was fair and his task persistence was fair," and he "did not appear to be responding to internal stimuli."[135]

Dr. Goldman concluded that the plaintiff's verbal comprehension, working memory, processing speed, full-scale IQ, logical-memory I, visual-reproduction I, and visual-reproduction II were ranked "low average."[136]

Dr. Goldman diagnosed the plaintiff with depressive disorder and personality disorder and ruled out cannabis dependence.[137] She noted that the plaintiff had mild difficulties in maintaining social functioning, concentration, persistence, and the ability to work at a pace appropriate for his age.[138] "No repeated episodes of emotional deterioration in work like situations were indicated."[139] Furthermore, the plaintiff's ability "to understand, carry out and remember simple instructions was not impaired."[140] His abilities to understand, carry out and remember detailed instructions and

---

[131] Id.

[132] Id.

[133] Id.

[134] Id.

[135] AR 509, 510.

[136] AR 510–11.

[137] AR 511.

[138] Id.

[139] Id.

[140] Id.

complex tasks, respond appropriately to coworkers, respond appropriately to usual work situations were mildly impaired due to depression.[141]

### 2.2 Disability Determination Explanation — Initial

Tawnya Brode, Psy. D., analyzed the plaintiff's mental-health records.[142] She concluded that the plaintiff would have mild difficulty maintaining social function and mild difficulty with concentration, persistence, and ability to work at a pace appropriate for his age.[143] She found that the plaintiff was mildly impaired in his ability to understand, carry out, and remember detailed instructions and complex tasks, his ability to respond appropriately to coworkers, supervisors, and the public, and his ability to respond to usual work situations and deal with changes in his work setting.[144] His ability to understand, remember, and carry out simple instructions was not impaired.[145]

On January 15, 2015, A. Lizarraras, M.D., performed a residual-functional-capacity assessment for the plaintiff's disability determination.[146] Dr. Lizarraras found that the plaintiff could occasionally lift and carry 20 pounds and could frequently lift and carry ten pounds.[147] The plaintiff could stand and walk for a more than six hours on a sustained basis and sit for a total of about six hours in an eight-hour workday.[148] His ability to push and pull was "unlimited."[149] The plaintiff had postural limitations: he could "frequently" climb ramps and stairs and balance and could "occasionally" climb ladders, ropes, and scaffolds, stoop, kneel, crouch, or crawl.[150] The

---

[141] *Id.*

[142] AR 81–82.

[143] AR 82.

[144] *Id.*

[145] *Id.*

[146] AR 85–88.

[147] AR 85.

[148] *Id.*

[149] *Id.*

[150] *Id.*

plaintiff had no visual, communicative, or environmental limitations.[151] Dr. Lizarraras said that "more weight is assigned to the longitudinal evidence that documents [spinal] L4–5 laminectomy [without] functionally significant neurological deficits or mechanical signs of radiculopathy or symptoms of classical cauda equina syndrome, and [spinal] right knee surgery without e/o instability. OSA is stable [with] CPAP."[152] Dr. Lizarraras concluded that, given the plaintiff's age, education, and past relevant work, he was "not disabled."[153]

### 2.3 Disability Determination Explanation – Reconsideration

On May 5, 2015, Dr. Pong made another disability determination at the reconsideration level.[154] Dr. Pong reviewed the plaintiff's MRI, concluded that the MRI findings were "mild to moderate, 5/5, [normal] gait," and agreed with Dr. Lizarraras's findings that modified light work was appropriate for the plaintiff.[155]

Norman Zykowsky, Ph.D., analyzed the plaintiff's mental-health records and found that he had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.[156] The plaintiff had no repeated episodes of decompensation.[157]

### 2.4 Orlene Daigle — Function Report

Orlene Daigle is the plaintiff's mother. The plaintiff has lived with her since 2013.[158] In a function report dated January 20, 2015, Ms. Daigle stated that the plaintiff was not able to prepare meals, shop, or clean, that he could not "sit or stand for even short periods of time," he suffered

---

[151] AR 86.

[152] Id.

[153] Id.

[154] AR 122–23.

[155] AR 123.

[156] Id.

[157] Id.

[158] AR 252.

from high levels of pain and anxiety, and he had panic attacks in public.[159] She helped the plaintiff with meals, baths, walking, and taking medications.[160] The plaintiff's sleep was affected because he had to wake up to take medications for his pain and suffered from sleep apnea.[161] The plaintiff did not spend time with other people except on the computer or the phone.[162] The plaintiff was able to walk only a half of a block before having to rest, and he was able to pay attention for about five minutes at a time.[163]

### 3. Administrative Proceedings

#### 3.1 Plaintiff's Testimony

The plaintiff submitted a work history report on January 13, 2015.[164] He worked as an iron worker from 1996 to 2006, as a mechanic from 2006 to 2007, and as a caregiver from 2007 to August, 15, 2013.[165] As a caregiver, the plaintiff's job responsibilities included house cleaning, grocery shopping, giving baths, cleaning the bathroom, laundry, and running errands.[166] The job required the plaintiff to walk, stand, stoop, kneel, crouch, reach, write, and type for a significant amount of time.[167] It also required lifting and carrying up to 50 lbs.[168]

The plaintiff submitted an adult-function report on September 13, 2019.[169] He described his daily routine as follows. He woke up at 6:00 a.m. to take medication and then went back to sleep until 9:00 a.m., then he spent forty-five minutes showering and one hour eating after his mother

---

[159] *Id.*

[160] AR 253.

[161] *Id.*

[162] AR 256.

[163] AR 257.

[164] AR 211–21.

[165] AR 238.

[166] AR 239.

[167] *Id.*

[168] *Id.*

[169] AR 213–14.

prepared his food.[170] He had too much pain when he stood or sat too long and had to lie down to ease the pain.[171] He also stated that because three people he cared for as a caregiver died, and because his pain medicine had side effects, it was difficult for him to be around people.[172] His pain, anxiety and stress kept him from sleeping.[173] He was not able to dress himself, take a bath, take care of his hair, shave, feed himself, or use the toilet until his pain medication took effect.[174] He needed help from his mother to eat meals and to get around. He could walk only 30 yards before needing to rest for about two to three minutes.[175]

The plaintiff testified at the hearing on November 1, 2016.[176] The ALJ first asked the plaintiff about his work history.[177] The plaintiff testified that he was an iron worker for 12 years.[178] While working as an iron worker, he lifted 50 pounds without assistance and sometimes more than 100 pounds.[179] He also went through training to become an auto mechanic and worked in that capacity at two Ford dealerships in Santa Cruz for about three years.[180] As a mechanic, the plaintiff lifted more than 50 pounds alone, but he did not lift more than 100 pounds.[181] The plaintiff supervised other people while at Scott's Valley Ford, which consisted of assigning and inspecting their work.[182] In 2008, the plaintiff could no longer perform the work of an auto mechanic, and he became an in-home healthcare provider for his ill wife and multiple other patients in the County of

---

[170] AR 214.

[171] AR 213.

[172] *Id.*

[173] AR 214.

[174] *Id.*

[175] *Id.*

[176] AR 48.

[177] *Id.*

[178] AR 49.

[179] *Id.*

[180] AR 50–51.

[181] AR 50.

[182] AR 52.

Santa Cruz.[183] The in-home healthcare-provider job required the plaintiff to perform domestic duties, including laundry, shopping, cleaning, and physical care, such as giving baths.[184] The plaintiff lifted more than 100 pounds while in this job.[185] The plaintiff remained in this job until September 2013.[186] He has not worked since.[187]

The ALJ asked the plaintiff about his education.[188] The plaintiff received his GED in 1991 (he went to high school but did not finish twelfth grade).[189] After high school, the plaintiff began and completed a three-year apprenticeship as a union iron worker.[190] He also completed a six-month program to become certified as an auto mechanic.[191] In August 2013, the plaintiff completed two semesters of school, working toward an associate's degree in horticulture.[192] He was unable to complete assignments and sit in class due to pain and medication.[193] The plaintiff said that "getting to school was an issue, driving, being on medication."[194] He could not sit comfortably through a whole class and was unable to concentrate or retain information.[195]

The plaintiff had a driver's license and a car, but he no longer drove "because of [his] pain medication."[196] His mother drove him to medical appointments.[197]

---

[183] AR 51.

[184] AR 53.

[185] *Id.*

[186] AR 54.

[187] *Id.*

[188] AR 55.

[189] *Id.*

[190] *Id.*

[191] AR 56.

[192] AR 57, 58.

[193] AR 57.

[194] *Id.*

[195] *Id.*

[196] AR 58.

[197] AR 59.

The ALJ asked the plaintiff about his activities.[198] The plaintiff used to be able to surf, hike, go rock-climbing and mountain-climbing, and socialize, but he was no longer able to do those things.[199] The plaintiff could do a 10- to 15-minute walk, equivalent to about 1,000 yards.[200] He did this about two to three times per week, depending on the severity of his pain.[201] It had been years since he went biking or swimming.[202]

The plaintiff lived in a studio apartment with his mother.[203] On a typical day, the plaintiff got up for about one hour to take his medication and sat in a chair for about 45 minutes waiting for the pain medication to "kick[]-in" and ate food that his mother brought him.[204] The plaintiff iced his back three to four times a day.[205] He ate dinner at around 6:00 p.m. and then took pain medication, which made him sleepy.[206] The plaintiff watched television, checked email, read magazines, and interacted with friends on Facebook.[207]

The ALJ asked the plaintiff why he was unable to work.[208] The plaintiff said that he was in severe pain, he was physically dilapidated, and he needed surgery.[209]

The plaintiff's attorney asked him about the accident he suffered and his subsequent treatment.[210] The plaintiff said that in 2014, he fell off a truck and injured his neck, shoulder, and

---

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] AR 59–60.

[203] AR 60.

[204] *Id.*

[205] *Id.*

[206] AR 61.

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] *Id.*

lower back.[211] He immediately began seeing his primary doctor, Dr. Solomon.[212] Dr. Solomon prescribed him hydrocodone and morphine.[213] Dr. Li gave the plaintiff epidural injections, which were not successful.[214] Dr. Daniels ordered an MRI for the plaintiff's back, and he noted that the plaintiff had injections, physical therapy, massage therapy, and medications, which were never helpful for his back.[215] The plaintiff stated that Dr. Daniels wanted him to lose weight and see his psychiatrist before performing surgery.[216] The plaintiff had lost 20 pounds and was in the process of scheduling his surgery.[217]

The plaintiff's attorney asked him about his activities and limitations.[218] The plaintiff said that he could cook and clean in the past, but he could not do so because he was in "too much pain."[219] The plaintiff could sit 20 to 15 minutes and stand for 15 minutes comfortably.[220] He had to lie down four to six times per day due to back pain.[221] His neck pain gave him headaches and caused his hands and legs to feel numb.[222] It was difficult for the plaintiff to bend, lift, or kneel, and the most he could lift was a liter of soda.[223] The plaintiff was still on narcotics and had problems with

---

[211] AR 62.

[212] *Id.*

[213] AR 63. The transcript reads "hydro-codeine," but Dr. Solomon's records show that he was prescribed hydrocodone. AR 383.

[214] AR 63.

[215] AR 64.

[216] *Id.*

[217] AR 65.

[218] *Id.*

[219] AR 66.

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] *Id.*

attention and concentration.[224] He had major problems retaining information, such as remembering what he saw on television.[225]

### 3.2 Vocational Expert Testimony

Vocational Expert ("VE") Darlene McQuary testified at the November 1, 2016 hearing.[226]

The ALJ posed the following hypothetical to the VE:

> Assume an individual who was limited to light exertion that did not require more than frequent balancing or climbing of stairs and ramps, and did not require more than occasional stooping, kneeling, crouching, crawling or climbing of ladders, ropes and scaffolds.[227]

The ALJ asked whether such a person could perform any of the plaintiff's prior jobs, and the VE said he could not.[228] The ALJ asked whether there were other jobs that the hypothetical person could do. The VE gave four possible jobs: companion (SVP of 3, light work, 985,230 jobs nationally), cashier (SVP of 2, light work, 3,920,000 jobs nationally), agriculture sorting and grading (SVP of 2, light work, 500,000 jobs nationally), and egg washing machine operator (SVP of 1, light work, 75,790 jobs nationally).[229]

The ALJ asked the VE to consider the first hypothetical again, and to add "that the person was limited to simple, repetitive tasks."[230] The ALJ asked whether such a person could do the jobs the VE identified, and the VE said that he could.[231]

Mr. Barry's attorney posed the following hypothetical:

---

[224] *Id.*

[225] AR 66–67.

[226] AR 69–73.

[227] AR 69.

[228] *Id.*

[229] AR 70–71. Specific Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." On the SVP scale, a 2 refers to any training "beyond short demonstration up to and including 1 month." Dictionary of Occupational Titles, App. C, 1991 WL 688702 (4th ed. 1991).

[230] AR 71.

[231] *Id.*

> If you added onto the [first hypothetical] someone's off task more than half the day could not pay attention or concentrate[e], perform simple tasks, [was] unable to sit or stand more than 20 minutes at a time, and sit and stand cumulatively throughout the day for four hours; [would need] unscheduled breaks four to six times a day 30 minutes each time; unable to use hands for gripping, turning objects limited to 10% of the day; unable to use fingers for fine manipulation; unable to use arms for reaching; missing four days of work per month. Could such a person do any of the jobs you listed. . . ?[232]

The VE answered that such a person could not do the jobs she identified or any job in the national economy.[233]

### 3.3 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that he was not.[234]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since September 1, 2014 (the alleged onset date).[235]

At step two the ALJ found that the plaintiff had four severe impairments: degenerative-disc disease, status-post-remote-lumbar laminectomy, scoliosis, and obesity.[236] The ALJ held that the plaintiff's medically determinable mental impairments (depressive disorder, personality disorder, and affective disorder) and his right-knee orthoscopy were nonsevere because they did not cause "more than minimal limitation in the claimant's ability to perform basic work activities."[237] The ALJ also found that the plaintiff's obstructive-sleep apnea was nonsevere because it was "stable with the usage of the CPAP machine."[238] The ALJ held that the plaintiff's left-shoulder injury was

---

[232] AR 71–72.

[233] AR 72.

[234] AR 23–38.

[235] AR 25.

[236] *Id.*

[237] AR 26, 28, 29.

[238] AR 29.

nonsevere because he received limited treatment and so it did not "meet the 12-month durational requirement to be a severe impairment."[239]

The ALJ held that the plaintiff's possible cannabis dependence was a non-medically determinable impairment because Dr. Goldman raised the issue but never made a diagnosis.[240] The ALJ found that the plaintiff's alleged anxiety and PTSD were non-medically determinable impairments because neither was "established by medical evidence consisting of signs, symptoms, and laboratory findings."[241] The ALJ found the plaintiff's alleged learning disorder to be non-medically determinable because he was "not diagnosed with a learning disability [by] an acceptable medical source."[242]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity requirements of a listing.[243] Specifically, the ALJ considered listing 1.04 (disorders of the spine) and found that the plaintiff did not meet the criteria because there was "no evidence of positive straight-leg raising in both the sitting and supine positions, reflex loss, muscle weakness or atrophy; or psuedoclaudication and inability to ambulate effectively."[244] While there is no listing specifically addressing obesity, the ALJ held

---

[239] Id.

[240] AR 28.

[241] Id.

[242] Id.

[243] AR 29–30.

[244] AR 30. The listing in full is as follows. Listing 1.04, *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and

that the plaintiff's obesity "[did] not meet a listing based on [his] other impairments, or in combination with [his] other impairments."[245]

At step four, the ALJ concluded that the plaintiff was unable to perform his past relevant work as an iron worker, auto mechanic, or caregiver, which were at medium and/or heavy level.[246] The ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform light work with "no more than frequent balancing or climbing stairs or ramps; and no more than occasional stooping, kneeling, crouching, crawling or climbing ropes, ladders or scaffolds."[247]

The ALJ held that some of the plaintiff's alleged symptoms could be reasonably expected to be caused by his medically determinable impairments, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the medical evidence and other evidence in the record."[248]

The ALJ found that the record did not support the plaintiff's claims about the ongoing impact of his degenerative-disc disease on his life.[249] For example, on December 6, 2013, Dr. Solomon reported that the plaintiff was walking three to four times a week for 20 to 45 minutes per day; on July 22, 2014, Julie Gorshe, PA, found that the plaintiff's back was nontender with normal range of motion; on October 2, 2015, Dr. Solomon found that the plaintiff's extremities were warm with no C/C/E (cyanosis, clubbing, edema); and in a neurological examination, the strength was five out of five, and sensations were intact.[250]

The ALJ gave great weight to the State-agency-medical consultants' opinions.[251] They "carefully evaluated the claimant's medical record" and concluded that the plaintiff was "limited

---

resulting in inability to ambulate effectively, as defined in 1.00B2b. 20 C.F.R. Part 404, Subpt. P, appx. 1.

[245] AR 30.

[246] AR 35, 36.

[247] AR 30.

[248] AR 33.

[249] *Id.*

[250] *Id.*

[251] AR 34.

to light work, frequently climbing ramps and stairs and balancing; and occasionally climbing ropes, ladders, or scaffolds, stooping, kneeling, crouching and crawling."[252] The ALJ found that the consultants' opinions concerning the plaintiff's residual functional capacity were "consistent with the physical examinations in the medical records, as well as the claimant's statements of swimming, walking, and biking."[253]

The ALJ did not give significant weight to Dr. Solomon's opinion because it was "inconsistent with her own treatment notes, the longitudinal treatment course, other medical findings by treating specialists, other probative medical opinions, daily activities involving biking, swimming and schooling, and other inconsistencies noted in this decision."[254]

The ALJ accorded little weight to Orlene Daigle's third-party function report because she was not an acceptable medical source, her report echoed the plaintiff's function report, and her description was inconsistent with the medical records and other evidence.[255]

At step five, the ALJ determined that, considering the plaintiff's age, education, work experience, and residual functional capacity, he had acquired work skills from past relevant work that were transferrable to other occupations with jobs existing in significant numbers in the national economy.[256] The ALJ relied on the VE's testimony that a person with the plaintiff's RFC could be a companion (985,230 jobs in the national economy), a cashier ( 3,922,000 jobs nationally), an agricultural sorter (500,000 jobs nationally), or an egg washer (75,790 jobs nationally) and concluded that the plaintiff was not disabled.[257]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

---

[252] *Id.*

[253] AR 34, 35.

[254] AR 35.

[255] *Id.*

[256] AR 37.

[257] AR 37–38.

United States District Court
Northern District of California

1    Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set

2    aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

3    are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d

4    586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g).

5    "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

6    relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

7    *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such

8    inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark

9    v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record

10   supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision

11   and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097– 98 (9th Cir. 1999).

12   "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless."

13   *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

14

15                                          **GOVERNING LAW**

16       A claimant is considered disabled if (1) he or she suffers from a "medically determinable

17   physical or mental impairment which can be expected to result in death or which has lasted or can

18   be expected to last for a continuous period of not less than twelve months," and (2) the

19   "impairment or impairments are of such severity that he or she is not only unable to do his

20   previous work but cannot, considering his age, education, and work experience, engage in any

21   other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §

22   1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled

23   within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20

24   C.F.R. § 404.1520).

25       **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the
26       claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a
         substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
27       evaluation proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i).

28       **Step Two**. Is the claimant's impairment (or combination of impairments) severe? If not, the

claimant is not disabled. If so, the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. See 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) improperly weighing and crediting the opinions of his treating physicians and (2) failing to properly credit plaintiff's testimony and third-party statements about the nature and impact of his functional limitations. The court holds that the ALJ erred by discounting the opinions of plaintiff's treating physicians and failing to properly credit the plaintiff's testimony and third-party statements about his functional limitations.

### 1. Failure to Properly Weigh Medical Evidence

The plaintiff contends that the ALJ erred by failing to provide legally sufficient reasons for discounting the opinions of Dr. Solomon and Dr. Daniels, the plaintiff's treating physicians.[258]

---

[258] Mot. – ECF No. 25 at 12–26.

The court remands because the ALJ did not give specific and legitimate reasons for rejecting their opinions.

### 1.1    Legal Standard

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); see also *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); see also *Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by

providing specific and legitimate reasons that are supported by substantial evidence.") (internal

quotation marks and citation omitted). The opinions of non-treating or non-examining physicians

may serve as substantial evidence when the opinions are consistent with independent clinical

findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without

explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es]

it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*,

759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-

supported' or because it is inconsistent with other substantial evidence in the record, the [Social

Security] Administration considers specified factors in determining the weight it will be given."

*Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the

frequency of examination' by the treating physician; and the 'nature and extent of the treatment

relationship' between the patient and the treating physician." *Id*. (quoting 20 C.F.R. §

404.1527(d)(2)(i)–(ii) ) (alteration in original). "Additional factors relevant to evaluating any

medical opinion, not limited to the opinion of the treating physician, include the amount of

relevant evidence that supports the opinion and the quality of the explanation provided[,] the

consistency of the medical opinion with the record as a whole[, and] the specialty of the physician

providing the opinion...." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

### 1.2    Dr. Solomon

The plaintiff argues that the ALJ failed to properly weigh and credit the opinion of Dr.

Solomon without giving legitimate reasons for doing so. The court agrees.

Dr. Solomon's opinion regarding the plaintiff's functional limitations was contradicted by the

opinions of non-examining physicians, Dr. Lizarras and Dr. Pong.[259] Thus, the ALJ was required

to provide specific and legitimate reasons for discounting Dr. Solomon's opinion.

In weighing the medical-opinion evidence from Dr. Solomon, the ALJ did not give Dr.

---

[259] *Compare* AR 566 *with* AR 85, 112.

United States District Court
Northern District of California

Solomon's opinion controlling weight because Dr. Solomon's residual-functional-capacity determination was "inconsistent with her own treatment notes, the longitudinal treatment course, other medical findings by treating specialists, other probative medical opinions, daily activities involving biking, swimming and schooling, and other inconsistencies noted in [the] decision."[260]

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Escamilla v. Berryhill*, No. 17-CV-01621-BAS-JMA, 2018 WL 2981156, at *6 (S.D. Cal. June 14, 2018) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Here, the ALJ cites two examinations, where Dr. Solomon noted that the plaintiff had normal gait and strength, to arrive at a conclusion that Dr. Solomon's opinion should be afforded little weight for lack of consistency.[261] The broader record shows that Dr. Solomon's RFC determination was consistent with her treatment records, other treating doctors' opinions, and the plaintiff's limitations in daily activities.

For example, Dr. Lin, who reported the plaintiff's MRI findings, indicated that the plaintiff had levoscoliosis of the lumbar spine and multilevel degenerative changes of the lumbar-intervertebral discs and facets, disc desiccation, loss of disc height, lateral protrusions, and joint arthrosis.[262] Dr. Lin opined that the plaintiff had "left-sided scoliosis with fairly extensive degenerative disc disease."[263] Dr. Lin also noted the plaintiff had tenderness to palpitation of the lumbar and cervical paraspinals with distribution of pain along L3, L4, L5 dermatomes of the bilateral lower extremities.[264] In 2016, Dr. Daniels opined that the plaintiff's functionality had

---

[260] AR 35.

[261] *Id.*

[262] AR 538–39.

[263] AR 371.

[264] AR 531.

1   decreased by 50% over the last two years.[265] Dr. Daniels also stated that the plaintiff had

2   multilevel lumbar spondylosis that had been refractory to multiple treatments.[266]

3       Dr. Solomon's findings also were consistent with her own treatment records, where she noted

4   chronic pain due to trauma, moderate scoliosis, narrowing of the right aspect of L3 to L4 disc

5   space and left aspect of L1–1 disc space, "fairly extensive degenerative disease," lumbar

6   radiculopathy, low-back and neck pain with associated numbness, and lumbar spondylosis, among

7   other conditions, over the course of several visits.[267] Dr. Solomon's RFC opinion was the most

8   recent RFC opinion on the record. "[A] treating physician's most recent medical records are

9   highly probative." *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001). Given that the

10  plaintiff's functionality decreased over the course of time, any contradicting information about the

11  plaintiff's functional limitations before Dr. Solomon's most recent opinion regarding functionality

12  is not necessarily inconsistent with her most recent opinion.[268]

13      Dr. Solomon's findings are also consistent with the record and show that the plaintiff has

14  experienced increasingly greater limitations in his daily activities. The plaintiff testified in the

15  November 2016 hearing that he used to be able to perform multiple activities, like biking and rock

16  climbing, but was no longer able to do them due to his pain and medication.[269] In 2014, Dr.

17  Solomon indicated in her treatment notes that the plaintiff had been trying to walk and swim daily,

18

19

20  [265] AR 563.

21  [266] AR 562. The plaintiff also points out that the ALJ did not consider Dr. Daniels's opinion that the
    plaintiff's "'functionality has decreased by 50% over the last 2 years. He is also having difficult with
22  mobility and bending activities. . . . [T]he patient has significant loss of ability to function, and the
    patient has decreased his activities of daily living since the day of the injury.'" Mot. – ECF No. 25 at
23  16 (quoting AR 563). The ALJ summarized some of Dr. Daniels' opinions but did not mention this
    opinion. AR 20–43. This is error. An ALJ must consider each medical opinion and — in weighing the
24  medical evidence — cannot reject an opinion or assign it little weight without explanation. 20  C.F.R.
    § 416.927(b); *Garrison*, 759 F.3d at 1012–12. Moreover, "where an ALJ does not explicitly reject a
25  medical opinion, [she] errs." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015) (quoting *Garrison*,
    759 F.3d at 1012). The ALJ can consider Dr. Daniels's opinion on remand.

26  [267] AR 499, 375, 533, 528, 536, 551 .

27  [268] AR 563.

    [269] AR 59.
28

ORDER – No. 17-cv-06394-LB            32

but his left shoulder pain prevented him from doing so.[270] Dr. Solomon noted that the pain, pain medication, and sleep apnea made the plaintiff's schooling difficult.[271]

Furthermore, the ALJ gave Dr. Solomon's opinion less than controlling weight without addressing the relevant factors for weighing a treating physician's opinion. *Orn*, 495 F. 3d at 631. The ALJ must consider the length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. *Id.* The ALJ did not address the fact that Dr. Solomon had been treating plaintiff as his primary-care physician since 1996 and the evidence of at least ten visits in the administrative record since 2013. And as discussed above, Dr. Solomon's opinion is consistent with the record as a whole.

The ALJ failed to consider the *Orn* factors and did not offer specific and legitimate reasons for discounting Dr. Solomon's opinion. Thus, the ALJ erred by discounting Dr. Solomon's medical opinion.

## 2. Failure to Credit Testimony

### 2.1 Plaintiff's Testimony

The plaintiff argues that the ALJ failed to credit his testimony without articulating clear and convincing reasons. The court agrees.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations

---

[270] AR 390–91.

[271] AR 390.

omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester*, 81 F.3d at 834); *see, e.g., Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

Here, there was objective medical evidence of the plaintiff's impairment, and there was no evidence of malingering. Thus, the ALJ needed to provide specific, clear, and convincing reasons for rejecting the plaintiff's testimony.

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of alleged symptoms" but that the plaintiff's "statements regarding the intensity, persistence and limiting effects were not consistent with the medical evidence and other evidence in the record."[272] The ALJ found that the plaintiff's pain symptoms were not consistent with his treatment with his specialists.[273] The ALJ also discussed the plaintiff's statements indicating that he wanted to postpone his surgery and his statements about daily activities, including driving.[274]

As stated above, an ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled. Instead she must consider the evidence as a whole in making a reasoned disability determination. *Williams v. Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015). The ALJ selectively relied on some entries in the record while ignoring

---

[272] AR 33.

[273] AR 34.

[274] AR 33.

others. A broader analysis of the record shows that the inconsistencies the ALJ relied on can be reconciled with the plaintiff's statements.

The ALJ cited statements made by Dr. Lin and Dr. Daniels — that the plaintiff should be weaned from his narcotic-pain medication before surgery — as inconsistent with the plaintiff's pain symptoms.[275] The ALJ focused on the doctors' suggestions about the reduction in narcotic pain medications in the plaintiff's treatment as opposed to the treatment record as whole, which shows persistent symptoms of pain, worsening of symptoms, and the recommendation of surgery as part of his treatment.[276] Though Dr. Li did suggest that the plaintiff reduce narcotic-pain medications in preparation for surgery, he still treated the plaintiff for his pain through cervical, lumbar, and epidural injections.[277] Furthermore, as the ALJ noted, more recent treatment notes indicate that the plaintiff continued taking narcotic medications for his pain in October 2016 and April 2017.[278] This is consistent with the plaintiff's continued complaints of pain. Thus, the alleged inconsistence was not a clear and convincing reason to reject the plaintiff's testimony of his pain symptoms.

The ALJ also stated that the plaintiff's testimony regarding his inability to drive is inconsistent with the record.[279] The plaintiff stated that he "no longer drives" and had not driven in the past year.[280] The ALJ said this was inconsistent with the plaintiff's statement to Dr. Goldman 21 months prior to the hearing, in February 2015.[281] She also cited the plaintiff's statements that he drove to school in 2013 and 2014 to support her assertion that the statements are inconsistent.[282] Nonetheless, the plaintiff's statement about his inability to drive in the past year is consistent with

---

[275] AR 34.

[276] Id.

[277] AR 28.

[278] AR 34, 8.

[279] AR 34.

[280] AR 58.

[281] AR 34.

[282] Id.

1    evidence of his driving more than one year earlier. This was not a clear and convincing reason to

2    reject his testimony.

3        The ALJ said that the plaintiff's statements — indicating that he needed to go through various

4    procedures with his doctor prior to surgery — were inconsistent with the plaintiff's previous

5    statements to his doctor that he wanted to put off surgery until his disability case was settled.[283]

6    Contrary to the ALJ's characterization, these two statements are not inconsistent. Dr. Daniels

7    recommended a chronic-pain psychology consultation prior to surgery.[284] Dr. Daniels opined that

8    it was "prudent" for the plaintiff to" defer surgery until after his social-economic status

9    stabilizes."[285] Dr. Summa was concerned that, due to the plaintiff's weight and high-dose opiates,

10   he was at significant risk of post-operative complications.[286] The plaintiff told Dr. Solomon that he

11   was "worried that [his having surgery would] cause too much work for his mom" and that he

12   could not afford in-home health care.[287] The plaintiff's desire to postpone surgery appears rooted

13   in financial concerns as opposed to reflecting decreased pain symptoms. Thus, this was not a clear

14   and convincing reason to reject the plaintiff's testimony.

15       In sum, the ALJ erred by rejecting the plaintiff's testimony about his pain symptoms and

16   limitations.

17   ## 2.2    Third-Party Testimony

18       The plaintiff argues that the ALJ erred by discounting Orlene Daigle's (the plaintiff's

19   mother's) testimony regarding the plaintiff's daily activities and limitations.[288]

20       The ALJ must consider "other source" testimony and evidence from a layperson. *Ghanim*, 763

21   F.3d at 1161; *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("In

22   determining whether a claimant is disabled, an ALJ must consider lay witness testimony

23

24   [283] *Id.*

25   [284] AR 559.

     [285] *Id.*

26   [286] AR 9.

27   [287] AR 576.

28   [288] Mot. – ECF No. 25 at 29–31.

concerning a claimant's ability to work") (internal quotation marks and citation omitted). "Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). It is competent evidence and "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). Moreover, if an ALJ decides to disregard the testimony of a lay witness, the ALJ must provide "specific" reasons that are "germane to that witness." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (internal citations omitted). The Ninth Circuit has not "required the ALJ to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. An ALJ may "point to" reasons already stated with respect to the testimony of one witness to reject similar testimony by a second witness. *Id*.

The ALJ accorded "little weight" to Orlene Daigle's third-party function report because "she [was] not an acceptable medical source," the report echoed with plaintiff's function report, and it was inconsistent with the medical records and other evidence.[289]

That Ms. Daigle was not an acceptable medical source is not a germane reason to disregard her testimony. *See Senorina G. v. Berryhill*, No. 5:18-cv-00534-JDE, 2019 WL 688206, at *8 (C.D. Cal. Feb. 19, 2019) (holding that the ALJ's rejection of a layperson's testimony simply because it is not from a medical professional is an "improper, non-germane" reason). The ALJ erred by rejecting Ms. Daigle's testimony.

The other reason offered by the ALJ — that Ms. Daigle's testimony was duplicative of the plaintiff's — could be a germane reason to discount her opinion.[290] *See Molina*, 674 F.3d at 1115

---

[289] AR 35.

[290] *Compare* AR 213 (the plaintiff stated that he could not stand, sit, or walk for long due to pain and that he could not be around a lot of people because of the effects of pain medications) *with* AR 252 (Ms. Daigle stated that the plaintiff could not sit or stand for even short periods of time and suffered from high anxiety and panic attacks in public); *compare* AR 214 (the plaintiff stated that he could dress himself, take a bath, care for his hair, or shave only after his medication took effect) *with* AR 253 (Ms. Daigle stated that the plaintiff had to be medicated before he could dress, bathe, care for his hair, and shave); *compare* AR 218 (the plaintiff stated that he could walk only 30 yards before taking a two-to three-minute break) *with* AR 257 (Ms. Daigle stated that the plaintiff could walk a half block before needing to rest for five minutes).

(holding that a layperson's testimony should be rejected if "it does not change the ultimate result."). Nevertheless, given the court's remand for reconsideration of the medical-opinion evidence and the plaintiff's testimony, the court remands on this issue too.

## CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 27, 2019

_____
LAUREL BEELER
United States Magistrate Judge